## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| ROBERT MONCAVAGE, DERIVATIVELY AND ON BEHALF OF OCWEN FINANCIAL CORPORATION, | ) ) ) ) | Case No. |

ROBERT MONCAVAGE,
DERIVATIVELY AND ON BEHALF OF
OCWEN FINANCIAL CORPORATION,   )

      Plaintiff,

      v.

RONALD M. FARIS, JOHN V. BRITTI,
WILLIAM C. ERBEY, WILBUR L. ROSS,
JR., ROBERT A. SALCETTI, TIMOTHY
M. HAYES, BARRY N. WISH, WILLIAM
H. LACY, AND RONALD J. KORN,

      Defendants,

      And

OCWEN FINANCIAL CORPORATION,

      Nominal Defendant.

Case No.

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR:**

**(1) BREACH OF FIDUCIARY DUTY;**
**(2) CORPORATE WASTE;**
**(3) GROSS MISMANAGEMENT; AND**
**(4) UNJUST ENRICHMENT**

**JURY TRIAL DEMANDED**

---

        Plaintiff Robert Moncavage ("Plaintiff"), by her undersigned attorneys, derivatively and

on behalf of Nominal Defendant Ocwen Financial Corporation ("Ocwen" or the "Company"),

files this Verified Shareholder Derivative Complaint against Individual Defendants Ronald M.

Faris, John V. Britti, William C. Erbey, Wilbur L. Ross, Jr., Robert A. Salcetti, Timothy M.

Hayes, Barry N. Wish, William H. Lacy, and Ronald J. Korn, (collectively, the "Individual

Defendants") for breaches of their fiduciary duties as directors and/or officers of Ocwen, gross

mismanagement, abuse of control, and unjust enrichment for her complaint against Individual

Defendants, alleges the following based upon personal knowledge as to herself and her own acts,

and information and belief as to all other matters, based upon, *inter alia*, the investigation

1

conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ocwen, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action which seeks to remedy wrongdoing committed by Ocwen's directors and officers between May 2, 2013, inclusive, through the present (the "Relevant Period").

2.  Ocwen is a Florida corporation with offices in Florida and its principal place of business in Georgia. Ocwen's stock trades on the New York Stock Exchange ("NYSE") and trades under ticker "OCN."

3.  According to Ocwen's Form 10-K-A filed with the SEC on August 18, 2014 (2013 10-K-A), Ocwen "is a financial services holding company which, through its subsidiaries, is one of the largest mortgage companies in the United States... Ocwen is headquartered in Atlanta, Georgia with offices throughout the United States (U.S.) and in the United States Virgin Islands (USVI) with support operations in India, the Philippines and Uruguay. Ocwen Financial Corporation is a Florida corporation organized in February 1988. Ocwen is the fourth largest servicer of mortgage loans in the United States and with its predecessors has been servicing

residential mortgage loans since 1988. We have been originating forward mortgage loans since 2012 and reverse mortgage loans since mid-2013."

4.      The Individual Defendants breached their fiduciary duties by causing the Company's mortgage-servicing practices to violate applicable regulations and laws and to issue false and misleading statements of material facts and omissions of material information from Ocwen's public disclosures.  Such violations of law, among other things, caused the Company to enter a $2.2 billion settlement with the Consumer Financial Protection Bureau ("CFPB") and 49 attorneys general from 49 states, and caused a $2.7 deal to purchase mortgage-servicing rights from Wells Fargo to be halted by the New York Department of Financial Services ("NY DFS").

5.      The Individual Defendants breached their fiduciary duties by approving transactions with Altisource Portfolio Solutions, S.A. ("Altisource"), a company of which Defendant William C. Erbey ("Erbey"), Ocwen's Chairman of the Board, owns approximately 27% of its shares outstanding, such that Altisource imposed wholly unreasonable rates for services provided to Ocwen during the Relevant Period.  Additionally, the Individual Defendants caused Ocwen to fail to disclose the same.

6.      The Individual Defendants breached their fiduciary duties by approving transactions with Altisource's subsidiary, Hubzu, such that Hubzu has been "charging auction fees on Ocwen-serviced properties that are up to three times the fees charged to non-Ocwen customers."  Additionally, the Individual Defendants caused Ocwen to fail to disclose the same.

7.      The Individual Defendants breached their fiduciary duties by failing to prevent the Company from sending mortgage-modification denial letters to its borrowers that were backdated, in many cases more than 30 days before they were sent, thus preventing the

borrowers from appealing the denials before it was too late to be allowed to make the appeals. Additionally, the Individual Defendants caused Ocwen to fail to disclose the same.

8.       The Individual Defendants breached their fiduciary duties by failing to prevent Ocwen from engaging in improper accounting of the sale of mortgage-servicing rights to Home Loan Servicing Solutions, Ltd. ("HLSS"), an affiliate of Ocwen in which Defendant Erbey owns a substantial stake and is also Chairman of the Board.

9.       The Individual Defendants breached their fiduciary duties by causing the Company to file with the SEC materially false and misleading financial statements for the first quarter of 2014 and last quarter of 2013 that overstated the Company's net income and understated the Company's expenses and total liabilities.    The Company restated Ocwen's financial statements for the first quarter of 2014 and last quarter of 2013 were restated August 18, 2014 because of the improper accounting of the sale of mortgage-servicing rights to HLSS.

10.      The Individual Defendants breached their fiduciary duties by causing the Company to lack adequate internal and financial controls during the Relevant Period. Additionally, the Individual Defendants caused Ocwen to fail to disclose the same.

11.      Ocwen's lack of adequate internal controls has caused the Company to make the aforementioned false and misleading statements and to engage in the aforementioned illicit practices in connection with its mortgage servicing business.

12.      These breaches of fiduciary duty have subjected the Company to multiple federal securities fraud class action lawsuits, to the need to undertake internal investigations, a $2.2 billion settlement loss, the loss of the $2.7 billion dollar deal with Wells Fargo, loss of profits

due to Defendant Erbey's self-dealing transactions, and, additionally, will cost the Company going forward millions, if not billions of dollars.

13. As a result of Defendants' false and misleading statements, the price of Ocwen common stock traded at artificially inflated prices throughout the Relevant Period.

14. As a result of Defendants' false and misleading statements and illicit practices in connection with its mortgage servicing business, the price of Ocwen stock, plummeted from a high during the Relevant Period (in intraday trading on October 28, 2013) of $60.18 per share to close at $18.88 per share on October 27, 2014.

15. In light of the Individual Defendants' conduct, which has subjected the Company, Ocwen's Executive Chairman, CEO who is also a Director, and Executive Vice President who is also Chief Investment Officer to being named as defendants in several federal securities fraud class action lawsuits, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

16. The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

17. Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District,

or is an individual who is a citizen of Florida or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

20.     Plaintiff is a current shareholder of Ocwen.  Plaintiff has been a shareholder of Ocwen common stock since before the beginning of the Relevant Period, and has continuously held Ocwen common stock at all relevant times.  Plaintiff is a citizen of Pennsylvania.

21.     Nominal Defendant Ocwen is a Florida Corporation and maintains offices located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409.  During the Relevant Period, the Company's stock was listed on the New York Stock Exchange under ticker "OCN." Ocwen is a citizen of Florida.

22.     Defendant Ronald M. Faris ("Faris") has been the Company's CEO since October 2010.  He served as a director of Ocwen since May 2003.  Faris served as the President of Ocwen since March 2001.  Until he was appointed President, Faris served as Executive Vice President of Ocwen since May 1998. Until he was appointed Executive Vice President, Faris served as Senior Vice President of Ocwen since May 1997. Until he was appointed Senior Vice President, Faris served as Vice President and Chief Accounting Officer of Ocwen since June

1995. From March 1991 to July 1994, Faris served as Controller for a subsidiary of Ocwen. Upon information and belief, Faris is a citizen of Georgia.

23.     Defendant John V. Britti ("Britti") has been the Company's Executive Vice President & Chief Investment Officer since June 2014. Britti previously served as Ocwen's Chief Financial Officer since March 2012.  He has served at Ocwen since January 2011.  Upon information and belief, Britti is a citizen of Georgia.

24.     Defendant William C. Erbey ("Erbey") has served as Executive Chairman of the Board of Directors at Ocwen since September 1996. He served as the Chief Executive Officer at Ocwen from January 1988 to October 2010.  He served as the President of Ocwen from January 1988 to May 1998.  Erbey has served as Chairman of the Board of Directors at Altisource since July 2009.  Erbey has served as the Chairman of the Board of Directors of HLSS since December 2010, and he is the founder of HLSS.  Erbey has served as Chairman of the Board of Directors at Altisource Residential Corporation since July 2012.  Erbey has served as Chairman of the Board of Directors at Altisource Asset Management Corporation since March 2012. Upon information and belief, Erbey is a citizen of USVI.

25.     Defendant Timothy M. Hayes ("Hayes") has served as Executive Vice President, General Counsel, and Secretary at Ocwen since April 2013.  Previous to serving in those roles, Hayes served as Chief of Staff to the Chief Executive Officer of Homeward Residential, Inc., a subsidiary of Ocwen, since June 2012. Upon information and belief, Hayes is a citizen of USVI.

26.     Defendant Ronald J. Korn ("Korn") has been a Director at Ocwen since May 2003. During the Relevant Period, Korn has been a member of the Compensation Committee and Chair of the Audit Committee.  According to the Company, Korn qualifies as an audit committee

financial expert.  Korn was a partner and employee of KPMG, LLP from 1961 to 1991.  He is a Certified Public Accountant.  He was also admitted to the New York Bar.  Upon information and belief, Korn is a citizen of Georgia.

27.     Defendant William H. Lacy ("Lacy") has been a Director at Ocwen since May 2002. During the Relevant Period, Lacy has been a member of the Nominating and Governance Committee and the Chair of the Compensation Committee.  Upon information and belief, Lacy is a citizen of Georgia.

28.     Defendant Wilbur L. Ross, Jr. ("Ross") has been a Director at Ocwen since March 2013. During the Relevant Period, Ross has been a member of the Compliance Committee and the Compensation Committee.  Upon information and belief, Ross is a citizen of Florida.

29.     Defendant Barry N. Wish   ("Wish") has been Chairman Emeritus Director at Ocwen since September 1996. Until his appointment as Chairman Emeritus Director, Wish served as Chairman of the Board of Directors at Ocwen since January 1988.  From 1983 to 1995 Wish served as a Managing General Partner of the Oxford Financial Group, which he founded, and which is Ocwen's predecessor.  Wish had also served as the Chairman of the Board of Directors at the Oxford Financial Group.  During the Relevant Period, wish has been a member of the Nominating and Governance Committee and the Audit Committee. According to the Company, Wish qualifies as an audit committee financial expert.   Upon information and belief, Wish is a citizen of Georgia.

30.     Defendant Robert A. Salcetti ("Salcetti") has been a Director at Ocwen since January 2011. During the Relevant Period, Ross has been a member of the Compliance Committee, the Nominating and Governance Committee, and the Audit Committee.  According

to the Company, Salcetti qualifies as an audit committee financial expert.  Upon information and belief, Salcetti is a citizen of Georgia.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.    By reason of their positions as officers, directors and/or fiduciaries of Ocwen and because of their ability to control the business and corporate affairs of Ocwen, the Individual Defendants owed Ocwen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ocwen in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Ocwen and its shareholders so as to benefit all shareholders equally.

32.    Each director and officer of the Company owes to Ocwen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ocwen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.    To discharge their duties, the officers and directors of Ocwen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Ocwen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company, including engaging in the Project and entering the Agreement.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Ocwen's Board at all relevant times.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing to Ocwen to engage in mortgage servicing practices that violated applicable regulations and laws, and by not maintaining adequate internal controls.

36.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about the Agreement and the Project, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Ocwen to make false and misleading statements and omissions of material facts.

37.     To discharge their duties, the officers and directors of Ocwen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Ocwen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida, the United States, and pursuant to the Ocwen's own Code of Business Conduct and Ethics and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Ocwen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Ocwen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ocwen's operations would comply with all

laws and Ocwen's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)        exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)        refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)        examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)        conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

38.        Each of the Individual Defendants further owed to Ocwen and the shareholders the duty of loyalty requiring that each favor Ocwen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

39.        At all times relevant hereto, the Individual Defendants were the agents of each other and of Ocwen and were at all times acting within the course and scope of such agency.

40.     Because of their advisory, executive, managerial, and directorial positions with Ocwen, each of the Individual Defendants had access to adverse, non-public information about the Company.

41.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ocwen.

42.     In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of federal securities laws, is unable to purchase $2.7 billion worth of mortgage-servicing rights from Wells Fargo, and is in the course of paying over three years a $2.2 billion settlement with CFPB and attorneys general in 49 states.  As a result, Ocwen has expended, and will continue to expend billions of dollars to rectify the Individual Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct throughout the Relevant Period. During the Relevant Period, the Individual Defendants caused the Company to conceal the true facts as alleged herein.

44.     The purpose and effect of the conspiracy, common enterprise and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (ii) to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

45.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently fail to maintain effective accounting and internal control policies and procedures. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ocwen, and was at all times acting within the course and scope of such agency.

## CODE OF BUSINESS CONDUCT AND ETHICS
## AND AUDIT COMMITTEE CHARTER

48.     Pursuant to the Code of Business Conduct and Ethics (the "Code of Ethics"), the conduct of all of the Company's officers, directors, and employees is governed by the Code of Ethics.

49.     Pursuant to the Audit Committee Charter, the rules of the Audit Committee must be consistent with the Audit Committee Charter.

## Code of Business Conduct and Ethics

- 14 -

50.     The Code of Ethics states that:

Ocwen Financial Corporation and its subsidiaries ("Ocwen" or the "Company") are committed to the highest standards of business conduct in our relationships with each other and with our customers/clients, suppliers, shareholders and others. This requires that we conduct our business in accordance with all applicable laws and regulations and in accordance with the highest standards of business ethics. Ocwen's Code of Business Conduct and Ethics (the "Code") helps each of us in this endeavor by providing a statement of the fundamental principles and key policies and procedures that govern the conduct of our business. Our business depends on the reputation of the Company and its employees for integrity and principled business conduct.

51.     The Code of Ethics provides, as to "Conflicts of Interest," that:

In order to maintain the highest degree of integrity in the conduct of Ocwen's business and to maintain your independent judgment, you must avoid any activity or personal interest that creates or appears to create a conflict between your interests and the interests of the Company. A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of the Company as a whole. A conflict situation can arise when you take actions or have interests that make it difficult for you to perform your company work objectively and effectively. You should never act in a manner that could cause you to lose your independence and objectivity or that could adversely affect the confidence of our customers/clients, suppliers, directors or fellow employees in the integrity of Ocwen or its procedures. Although we cannot list every conceivable conflict, following are some common examples that illustrate actual or apparent conflicts of interest that should be avoided.

*Improper Personal Benefits from the Company*
Conflicts of interest arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company. You may not accept any benefits from the Company that have not been duly authorized and approved pursuant to Company policy and procedure, including any Company loans or guarantees of your personal obligations.

*Financial Interests in Other Businesses*
Ocwen employees, members of the Board, and their immediate families may not have an ownership interest in any other enterprise if that interest compromises or appears to compromise the employee's loyalty to Ocwen. For example, you may not own an interest in a company that competes with Ocwen. You may not own an interest in a company that does business with Ocwen (such as an Ocwen customer/client or supplier) without the prior written approval of the Senior-most Executive of Internal Audit and/or the General Counsel. Executive officers and members of the Board must obtain the written approval of the Audit Committee of the Board of Directors (the "Audit Committee") before making any such investment. However, it is not considered a conflict of interest (and

therefore, prior approval is not required) to make investments of less than five percent (5%) of the outstanding common stock in competitors, customers/clients or suppliers that are listed on a national or international securities exchange.

*Business Arrangements with the Company*

Without prior written approval from the Chief Executive Officer, you may not participate in a joint venture, partnership or other business arrangement with Ocwen. (Executive officers and members of the Board must obtain the prior written approval of the Audit Committee before participating in such an arrangement.)

*Outside Employment or Activities with a Competitor*

Simultaneous employment with or serving as a director of a competitor of Ocwen is strictly prohibited, as is any activity that is intended to or that you should reasonably expect to advance a competitor's interests. You may not market products or services in competition with Ocwen's current or potential business activities. It is your responsibility to consult with the Senior-most Executive of Internal Audit and/or the General Counsel to determine whether a planned activity will compete with any of Ocwen's business activities before you pursue the activity in question.

*Real Estate Transactions*

Ocwen engages REALHome Services and Solutions, Inc. ("RHSS") to assist investors with the disposition of real property that the investor acquired as a result of a foreclosure sale. Neither you nor members of your immediate family, nor entities that you or they may be associated with, may purchase any investor-owned REO property, as such purchase may result in a potential conflict of interest.

In addition, Ocwen does not allow you or members of your immediate family to purchase or dispose of Ocwen owned real or personal property unless the property is offered to the public by the Company and you obtain prior approval of the Company's Executive Committee, or if you are a Company director or executive officer, the approval of the Audit Committee.

*Outside Employment with a Customer/Client or Supplier*

Without prior written approval from the Senior-most Executive of Internal Audit and/or the General Counsel, you may not be a customer/client or be employed by, serve as a director of or represent a customer/client of Ocwen. Similarly, without prior written approval from the Senior-most Executive of Internal Audit and/or the General Counsel, you may not be a supplier or be employed by, serve as a director of or represent a supplier to Ocwen. (Executive officers and members of the Board must obtain the prior written approval of the Audit Committee before participating in such an arrangement.) You may not accept money or benefits of any kind as compensation or payment for any advice or services that you may provide to a client, supplier or anyone else in connection with its business with Ocwen.

*Vendors or Other Service Providers*

Only the Vendor Management provider procured on behalf of the Company is authorized to approve orders, contracts and/or commitments to suppliers of goods and services. Such decisions must be strictly based on objective business standards. Any real or perceived favoritism may result in a conflict of interest that could reflect poorly on the Company and other businesses.

52.     The Code of Ethics provides, as to "Corporate Opportunities," that:

As employees, officers and directors of Ocwen, we owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises. You may not take for yourself, opportunities that are discovered through the use of corporate property, information or position or use corporate property, information or position for personal gain. Nor may you compete with the Company.

53.     The Code of Ethics provides, as to "Company Books and Records," that:

You must complete all Company documents accurately, truthfully and in a timely manner, including all travel and expense reports. When applicable, documents must be properly authorized. You must record the Company's financial activities in compliance with all applicable laws and accounting practices. The making of false or misleading entries, records or documentation is strictly prohibited. You must never create a false or misleading report or make a payment or establish an account on behalf of the Company with the understanding that any part of the payment or account is to be used for a purpose other than as described by the supporting documents.

If you have any reason to believe that any of the Company's books and records are being maintained in a materially inaccurate or incomplete manner, you are required to report this immediately pursuant to the procedure set forth in "Policy and Procedures for Employee Complaints of Accounting, Internal Controls, Auditing and Securities Law Matters" that is distributed annually and available for reference in your Axentis File Cabinet. Similarly, the Company trusts you to report all complaints, allegations and similar submissions regarding the appropriateness of accounting, internal controls, auditing or securities law matters, especially if you ever feel pressured to prepare, alter, conceal    or    destroy    documents    in    lieu    of    standard    accounting.

54.     The Code of Ethics provides, as to "Insider Trading," that:

You are prohibited by Company policy and the law from buying or selling securities of the Company at a time when in possession of "material nonpublic information." (There is, however, an exception for trades made pursuant to a pre-existing trading plan which should be discussed with your legal counsel. A person who wishes to enter into a trading plan must submit the plan to the Law Department for approval prior to the adoption,

modification or termination of the trading plan.) This conduct is known as "insider trading." Passing such information on to someone who may buy or sell securities – known as "tipping" – is also illegal. The prohibition applies to Company securities and to securities of other companies.

Information is "material" if (a) there is a substantial likelihood that a reasonable investor would find the information "important" in determining whether to trade in a security; or (b) the information, if made public, likely would affect the market price of a company's securities. Examples of types of material information include unannounced dividends, earnings, financial results, new or lost contracts or products, sales results, important personnel changes, business plans, possible mergers, acquisitions, divestitures or joint ventures, important litigation developments, and important regulatory, judicial or legislative actions. Information may be material even if it relates to future, speculative or contingent events and even if it is significant only when considered in combination with publicly available information.

Examples of material non-public information might include:

- operating or financial results of the company or its major business units (including estimates of any future earnings or losses);
- negotiations or entry into an agreement for an acquisition or sale of a substantial business or other significant transaction;
- development of a major new product or service by the company;
- an increase or decrease in dividends of the company;
- a stock split or other recapitalization of the company;
- a redemption or purchase by the Company of its securities;
- major management changes at the Company;
- mergers, acquisitions, tender offers and restructurings;
- securities offerings and repurchases;
- significant litigation or litigation developments; and
- developments regarding customers, clients or suppliers.

Information is considered to be nonpublic unless it has been adequately disclosed to the public, which means that the information must be publicly disclosed, and adequate time must have passed for the securities markets to digest the information. Examples of adequate disclosure include public filings with securities regulatory authorities and the issuance of press releases and may also include meetings with members of the press and the public. A delay of one or two business days is generally considered a sufficient period for routine information to be absorbed by the market. Nevertheless, a longer period of delay might be considered appropriate in more complex disclosures.

Do not disclose material nonpublic information to anyone, including co-workers, unless the person receiving the information has a legitimate need to know the information for purposes of carrying out the Company's business. If you leave Ocwen, you must

maintain the confidentiality of such information until it has been adequately disclosed to the public by the Company. If there is any question as to whether information regarding the Company or another company with which we have dealings is material or has been adequately disclosed to the public, contact the Law Department.

Notwithstanding the prohibition against insider trading, the law and Company policy permit Company employees, directors and officers to trade in Company securities regardless of their awareness of inside information if the transaction is made pursuant to a pre-arranged trading plan that was established in compliance with applicable law and was entered into when the person was not in possession of material nonpublic information. For more information, see Management Directive No. 5 - Prevention of Insider Trading.

55.    The Code of Ethics provides, as to "Fair Dealing," that:

Ocwen depends on its reputation for quality, service and integrity. The way we deal with our customers/clients, competitors and suppliers molds our reputation, builds long-term trust and ultimately determines our success. You should endeavor to deal fairly with the Company's customers/clients, suppliers, competitors, directors, and employees. We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice. Any comparisons with the competition used in any public forum or presentation must be represented fairly and accurately.

56.    The Code of Ethics provides, as to "Distribution Issues," that:

Relationships with customers and suppliers can also be subject to a number of antitrust prohibitions if these relationships harm competition. For example, it can be illegal for a company to affect competition by agreeing with a supplier to limit that supplier's sales to any of the company's competitors. Collective refusals to deal with a competitor, supplier or customer may be unlawful as well. While a company generally is allowed to decide independently that it does not wish to buy from or sell to a particular person, when such a decision is reached jointly with others, it may be unlawful, regardless of whether it seems commercially reasonable. Finally, it is always unlawful to restrict a customer's re-selling activity through minimum resale price maintenance (for example, by prohibiting discounts).

Other activities that can raise antitrust concerns are:

- discriminating in terms and services offered to customers where a company treats one customer or group of customers differently than another;

- exclusive dealing agreements where a company requires a customer to buy from or a supplier to sell to only that company;

- tying arrangements where a customer or supplier is required, as a condition of purchasing one product, to also purchase a second, distinct product;

- "bundled discounts," in which discount or rebate programs link the level of discounts available on one product to purchases of separate but related products (for example, pencils linked to other office supplies); and

- "predatory pricing," where a company offers a discount that results in the sales price of a product being below the product's cost (the definition of cost varies depending on the court), with the intention of sustaining that price long enough to drive competitors out of the market.

Because these activities are prohibited under many circumstances, you must consult the Law Department before implementing any of them.

57.     The Code of Ethics provides, as to "Reporting Violations," that:

If you know of or suspect a violation of applicable laws or regulations, the Code, or the Company's related policies, you must immediately report that information to the Conduct & Ethics Line (1.800.884.0953), the Senior-most Executive of Human Resources or a manager in the Human Resources Department, the Senior-most Executive of Internal Audit and/or the General Counsel. *No one will be subject to retaliation because of a good faith report of suspected misconduct.* However, failure to report a suspected violation of the Code is itself a violation of the Code and could subject you to disciplinary action, up to and including termination.

58.     The Code of Ethics provides, as to "Investigations of Suspected Violations," that:

All reported violations will be promptly investigated and treated confidentially to the greatest extent possible. It is imperative that reporting persons not conduct their own preliminary investigations. Investigations of alleged violations may involve complex legal issues, and acting on your own may compromise the integrity of an investigation and adversely affect both you and the Company.

59.     The Code of Ethics provides, as to "Discipline for Violations," that:

Ocwen intends to use every reasonable effort to prevent the occurrence of conduct not in compliance with its Code and to halt any such conduct that may occur as soon as reasonably possible after its discovery. Company personnel who violate this Code and other Company policies and procedures may be subject to disciplinary actions, up to and including termination. In addition, disciplinary measures, up to and including termination, may be taken against anyone who directs or approves infractions or has knowledge of them and does not promptly report and correct them in accordance with

Company policies.

60.     Throughout the Relevant Period, in violation of the Code of Ethics, the Individual

Defendants (as key officers and as members of the Company's Board) conducted little, if any,

oversight of the Company's internal controls over public reporting of transactions and financial

statements and of the Company's engagement in transactions, including mortgage-servicing

practices that violate applicable regulations and laws, consciously disregarded their duties to

monitor such controls over reporting and engagement in transactions, and consciously

disregarded their duties to protect corporate assets, engage in fair dealing, avoid using corporate

opportunities for personal gain, and avoid conflicts of interest.   The Individual Defendants'

complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to

the SEC, the investing public, and the Company's shareholders, and in engagement in

transactions that were not in the best interest of the Company.

### **Audit Committee Charter**

61.     During the Relevant Period, Defendants Korn, Salcetti, and Wish served on the

Company's Audit Committee.  Defendant Korn is the Chairman of the Audit Committee.  As

members of the Audit Committee, they had an affirmative duty of oversight and responsibility

for the integrity of Ocwen's disclosures and the "Company's compliance with legal and

regulatory requirements."

62.     The Company's Audit Committee is governed by the Audit Committee Charter.

63.     The purpose of the Company's Audit Committee is to "provide assistance to the

Board in fulfilling its legal and fiduciary obligations with respect to matters involving the

accounting, auditing, financial reporting, internal control and legal compliance functions of the

Company and its subsidiaries. This includes, without limitation, (a) assisting the Board's oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the Company's independent auditors' qualifications and independence and (iv) the performance of the Company's independent auditors and the Company's internal audit function, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement."

64.     Throughout the Relevant Period, in violation of the Audit Committee Charter, the Individual Defendants who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and of the Company's engagement in transactions, including mortgage-servicing practices that violate applicable regulations and laws, consciously disregarded their duties to monitor such controls over reporting and engagement in transactions, and consciously disregarded their duties to ensure that they and other officers, directors, and employees of Ocwen protect corporate assets, engage in fair dealing, avoid using corporate opportunities for personal gain, and avoid conflicts of interest. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in transactions that were not in the best interest of the Company.

## **DEFENDANTS' MISCONDUCT**

65.     On December 19, 2013, the first of several partial disclosures regarding the Company's illicit practices in connection with its mortgage servicing business was published. A

New York Times article entitled "Big Subprime Mortgage Loan Servicer Agrees to $2.2 billion Settlement" announced a $2.2 billion settlement entered into by Ocwen with the CFPB and 49 attorneys general from 49 states in connection with the Company's mortgage servicing business. The article stated that the Bureau "believe[s] that Ocwen violated federal consumer financial laws at every stage of the mortgage servicing process[.]"   Under the settlement agreement, Ocwen agreed to spend $2.1 billion over three years on "principal forgiveness modification programs for borrowers whose homes are worth less than they owe or who are behind on payments.  Ocwen also agreed to pay $127 million into a "consumer relief fund: to be distributed by an independent administrator."

66.     On February 6, 2014, Ocwen issued a press release stating that "at the request of the New York Department of Financial Services ("NY DFS"), its mortgage servicing arm has agreed to put an indefinite hold on its previously announced purchase from Wells Fargo Bank, N.A. of mortgage servicing rights on a portfolio consisting of approximately 184,000 loans with a total principal balance of $39 billion."

67.     As per the terms of the agreement, Ocwen was to pay Wells Fargo $2.7 billion in cash for the mortgage-servicing rights.

68.     On February 26, 2014, an article by Bloomberg entitled, "Lawsky Cites Ocwen Conflicts as He Reviews Wells Fargo Deal," further exposed Ocwen's improper operational practices. The article disclosed that the New York Department of Financial Services ("NY Department of Financial Services") issued a letter to the Company expressing concerns regarding Ocwen's business transactions with four related companies and Defendant Erbey's and other officers' and directors' involvement in approving transactions with said affiliates.  For example,

Benjamin Lawsky, the superintendant of New York's Department of Financial Services, said Ocwen's chief risk officer was also the chief risk officer of Altisource, "and reported directly to Mr. Erbey in both capacities."

69.     On April 21, 2014, Lawsky sent a letter to Ocwen, stating that he found it troubling that Ocwen uses Altisource's subsidiary, Hubzu, as its principal online auction website for the sale of its borrowers' homes that are facing foreclosure as well as investor-owned properties post-foreclosure. Lawsky stated that "Hubzu appears to be charging auction fees on Ocwen-serviced properties that are up to three times the fees charged to non-Ocwen customers." Lawsky further stated: "The relationship between Ocwen, Altisource Portfolio, and Hubzu raises significant concerns regarding self-dealing. In particular, it creates questions about whether those companies are charging inflated fees through conflicted business relationships, and thereby negatively impacting homeowners and mortgage investors. Alternatively, if the lower fees are necessary to attract non-Ocwen business on the open market, it raises concerns about whether Ocwen-serviced properties are being funneled into an uncompetitive platform at inflated costs." (Footnote omitted.)

70.     Yet Ocwen's quarterly report for the first quarter of 2013 filed on Form 10-Q with the SEC on May 8, 2013 ("1Q 2013 10-Q") falsely stated that its related party transactions were at market rates:

> Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC) . As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of March 31, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 26% of the common stock of Altisource, approximately 2% of the common stock of HLSS, approximately 24% of the common stock of Residential and approximately 24% of the common stock of AAMC.

Relationship with Altisource

Under the Services Agreement, Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things. Altisource also provides certain technology products and support services to Ocwen under the Technology Products Services Agreement and the Data Center and Disaster Recovery Services Agreement. In addition, under the Data Access and Services Agreement, Ocwen has agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee.

Under the Support Services Agreement, Ocwen and Altisource provide to each other services which are similar to those that Ocwen and Altisource provided to each other pursuant to the former Transition Services Agreement that expired August 10, 2012. These services are provided in such areas as human resources, vendor management, corporate services, accounting, tax matters, risk management, law and consumer psychology. The Support Services Agreement has an initial term of five years.

In connection with the sale to Altisource of the diversified fee-based business acquired in connection with the Homeward Acquisition, Ocwen agreed to extend to August 31, 2025 the terms of the Services Agreement, the Technology Products Services Agreement, the Data Center and Disaster Recovery Services Agreement and the Intellectual Property Agreement with Altisource. In addition, Ocwen agreed to expand the terms of the Services Agreement to apply to the services as they relate to the Homeward servicing platform and further to establish Altisource as the exclusive provider of such services as they relate to the Homeward servicing platform. In addition, Ocwen agreed not to establish similar fee-based businesses (or establish relationships with other companies engaged in the line of similar fee-based businesses) that would directly or indirectly compete with diversified fee-based businesses as they relate to the Homeward servicing platform acquired by Altisource.

Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

Our business is currently dependent on many of the services and products provided under these long-term contracts which are effective through 2025. The contracts include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

71.     The 1Q 2013 10-Q was signed by Defendant Britti.  The accompanying Sarbanes-Oxley Certifications were signed by Defendants Britti and Faris.

72.     Similarly, Ocwen's quarterly report for the second quarter of 2013 filed on Form 10-Q with the SEC on August 6, 2013 ("2Q 2013 10-Q") falsely stated that its related party transactions were at market rates:

> Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC) . As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of June 30, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 23% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 9% of the common stock of Residential and approximately 25% of the common stock of AAMC.
>
> Relationship with Altisource
>
> Under the Services Agreement, Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things. Altisource also provides certain technology products and support services to Ocwen under the Technology Products Services Agreement and the Data Center and Disaster Recovery Services Agreement. In addition, under the Data Access and Services Agreement, Ocwen has agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee. Under the Support Services Agreement, Ocwen and Altisource provide to each other services in such areas as human resources, vendor management, corporate services, accounting, tax matters, risk management, law and consumer psychology.
>
> In connection with the March 29, 2013 sale to Altisource of the diversified fee-based business acquired in connection with the Homeward Acquisition, Ocwen agreed to extend to August 31, 2025 the terms of the Services Agreement, the Technology Products Services Agreement, the Data Center and Disaster Recovery Services Agreement and the Intellectual Property Agreement with Altisource. In addition, Ocwen agreed to expand the terms of the Services Agreement to apply to the services as they relate to the Homeward servicing platform and further to establish Altisource as the exclusive provider of such services as they relate to the Homeward servicing platform. In addition, Ocwen agreed not to establish similar fee-based businesses (or establish relationships with other companies engaged in the line of similar fee-based businesses) that would

directly or indirectly compete with diversified fee-based businesses as they relate to the Homeward servicing platform acquired by Altisource.

Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

73.     The 2Q 2013 10-Q was signed by Defendant Britti.  The accompanying Sarbanes-

Oxley Certifications were signed by Defendants Britti and Faris.

74.     Similarly, Ocwen's quarterly report for the third quarter of 2013 filed on Form

10-Q with the SEC on November 5, 2013 ("3Q 2013 10-Q") falsely stated that its related party

transactions were at market rates:

Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC) . As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of September 30, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 23% of the common stock of Altisource, approximately 1% of the common stock of HLSS and approximately 9% of the common stock of AAMC. Mr. Erbey's percentage interest in Residential declined to 4% as a result of an additional public offering by Residential that closed on October 1, 2013.

Relationship with Altisource

Under the Services Agreement, Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things. Altisource also provides certain technology products and support services to Ocwen under the Technology Products Services Agreement and the Data

Center and Disaster Recovery Services Agreement. In addition, under the Data Access and Services Agreement, Ocwen has agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee. Under the Support Services Agreement, Ocwen and Altisource provide to each other services in such areas as human resources, vendor management, corporate services, accounting, tax matters, risk management, law and consumer psychology.

In connection with the March 29, 2013 sale to Altisource of the diversified fee-based business acquired in connection with the Homeward Acquisition, Ocwen agreed to extend to August 31, 2025 the terms of the Services Agreement, the Technology Products Services Agreement, the Data Center and Disaster Recovery Services Agreement and the Intellectual Property Agreement with Altisource. In addition, Ocwen agreed to expand the terms of the Services Agreement to apply to the services as they relate to the Homeward servicing platform and further to establish Altisource as the exclusive provider of such services as they relate to the Homeward servicing platform. In addition, Ocwen agreed not to establish similar fee-based businesses (or establish relationships with other companies engaged in the line of similar fee-based businesses) that would directly or indirectly compete with diversified fee-based businesses as they relate to the Homeward servicing platform acquired by Altisource.

Certain services provided by Altisource under these contracts are charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

75.     The 3Q 2013 10-Q was signed by Defendant Britti.  The accompanying Sarbanes-Oxley Certifications were signed by Defendants Britti and Faris.

76.     Similarly, Ocwen's annual report for the fiscal year ended on December 31, 2013 filed on Form 10-K with the SEC on March 3, 2013 ("2013 10-K") falsely stated that its related party transactions were at market rates:

- 28 -

Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 26% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 27% of the common stock of AAMC and approximately 5% of the common stock of Residential . At December 31, 2013 , Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock, 291,167 options to purchase Residential common stock and 87,350 options to purchase AAMC common stock , all of which were exercisable.

During 2012, Mr. Erbey relocated to St. Croix, USVI to serve as Chairman and CEO of OMS. On August 21, 2012, the Ocwen Board of Directors approved Ocwen's purchase of Mr. Erbey's residence in Atlanta, Georgia, for his cost-basis in the home of $6.5 million . The transaction is consistent with Ocwen's standard senior executive relocation policy and practice. We have classified our investment in this property as real estate held for sale, a component of Other assets. We account for the excess of cost over fair value (less costs to sell) as a valuation allowance and include changes in the valuation allowance in Loss on loans held for sale, net.

Relationship with Altisource

On August 10, 2009, Ocwen completed the distribution of its Ocwen Solutions (OS) line of business (the Separation) via the spin-off of Altisource, a separate publicly traded company. OS consisted primarily of Ocwen's former unsecured collections business, residential fee-based loan processing businesses and technology platforms. Since the spin-off, our relationship has been governed by a number of agreements that set forth the terms of our business with Altisource.

On August 10, 2012 and November 1, 2012, OMS and Ocwen each entered into a Support Services Agreement with Altisource setting forth certain services that we and Altisource will provide to each other, in such areas as human resources, vendor management, corporate services, six sigma, quality assurance, quantitative analytics, treasury, accounting, tax matters, risk management, strategic planning and compliance. These Support Services Agreements run through September 2018 and October 2017, respectively, with automatic one -year renewals thereafter.

On August 10, 2009 and October 1, 2012, Ocwen and OMS each entered into a Services Agreement, a Technology Products Services Agreement, an Intellectual Property Agreement and a Data Center and Disaster Recovery Services Agreement. Under the Services Agreements, Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other

things. Altisource provides certain technology products and support services under the Technology Products Services Agreements and the Data Center and Disaster Recovery Services Agreements. These agreements expire August 31, 2025 In addition, under a Data Access and Services Agreement, we agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee.

In connection with our March 29 and April 12, 2013, sales of the Homeward and ResCap diversified fee-based businesses to Altisource, we agreed to expand the terms of our business with Altisource to apply to the services Altisource provides as they relate to the Homeward and ResCap businesses and further (i) to establish Altisource as the exclusive provider, except as prohibited by law, of such services as they relate to the Homeward and ResCap businesses and (ii) not to establish similar fee-based businesses (or establish relationships with other companies engaged in the line of similar fee-based businesses) that would directly or indirectly compete with diversified fee-based businesses as they relate to the Homeward and ResCap businesses. In addition, we agreed that Ocwen and all of its subsidiaries and affiliates will market and promote the utilization of Altisource's services to their various third-party relationships. Finally, we and Altisource agreed to use commercially reasonable best efforts to ensure that the loans associated with the ResCap business are boarded onto Altisource's mortgage servicing platform (REALServicing). The cash consideration paid by Altisource to Ocwen in connection with the sales of the Homeward and ResCap diversified fee-based businesses totaled $87.0 million and $128.8 million , respectively. See Note 3 — Business Acquisitions for additional information. Certain services provided by Altisource under these contracts are charged to the borrower and/or investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

77.     The 2013 10-K also falsely stated that Ocwen was avoiding conflicts of interest with respect to Ocwen's dealings with Altisource, HLSS, and Residential.  The 2013 thus stated, in pertinent part:

Our Executive Chairman is the Chairman of Altisource, HLSS, AAMC and Residential. As a result, he has obligations to us as well as to Altisource, HLSS, AAMC and Residential and could have, could appear to have or could be alleged to have conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, HLSS, AAMC and Residential, as the case may be. Our Executive Chairman currently has significant investments in Altisource, HLSS, AAMC and Residential and certain of our other officers and directors own stock or options in one or more of Altisource, HLSS, AAMC and Residential. Such ownership interests could create, appear to create or be alleged to create conflicts of interest with respect to matters potentially or actually involving or affecting us and Altisource, HLSS, AAMC and Residential, as the case may be.

**We have adopted policies, procedures and practices to avoid potential conflicts with respect to our dealings with Altisource, HLSS, AAMC and Residential, including our Executive Chairmen recusing himself from negotiations regarding, and approvals of, transactions with these entities.** We also manage potential conflicts of interest through oversight by independent members of our Board of Directors (independent directors constitute a majority of our Board of Directors), and we will seek to manage these potential conflicts through dispute resolution and other provisions of our agreements with Altisource, HLSS, AAMC and Residential. There can be no assurance that such measures will be effective, that we will be able to resolve all potential conflicts with Altisource, HLSS, AAMC or Residential, as the case may be, or that the resolution of any such conflicts will be no less favorable to us than if we were dealing with a third party that had none of the connections we have with these businesses.

(Emphasis added.)

78.     The 2013 10-K was signed by Catherine M. Dondzila, ("Dondzila") and

Defendants Britti, Erbey, Faris, Korn, Lacy, Wish, Salcetti, and Ross.   The accompanying

Sarbanes-Oxley Certifications were signed by Defendants Britti and Faris.

79.     Ocwen's quarterly report for the first quarter of 2014 filed on Form 10-Q with the

SEC on May 2, 2014 ("1Q 2014 10-Q") falsely stated that its related party transactions were at

market rates:

Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of March 31, 2014, Mr. Erbey owned or controlled approximately 13% of the common

stock of Ocwen, approximately 27% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 25% of the common stock of AAMC and approximately 4% of the common stock of Residential . At March 31, 2014 , Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable. On April 22, 2014, Mr. Erbey surrendered 1,000,000 of his options to purchase Ocwen common stock. At March 31, 2014, Mr. Erbey held 873,501 options to purchase Altisource common stock and 87,350 options to purchase AAMC common stock , all of which were exercisable.

Our business is currently dependent on services and products provided by Altisource under various long-term contracts, including the Support Services, Services, Technology Products Services, Intellectual Property, Data Center and Disaster Recovery Services and Data Access and Services agreements, each of which include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

80.     The 1Q 2014 10-Q was signed by Defendant Britti.  The accompanying Sarbanes-

Oxley Certifications were signed by Defendants Britti and Faris.

81.     Ocwen's quarterly report for the second quarter of 2014 filed on Form 10-Q with

the SEC on August 18, 2014 ("2Q 2014 10-Q") also falsely stated that its related party

transactions were at market rates:

Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of June 30, 2014 , Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 27% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 27% of the common stock of AAMC and approximately 4% of the common stock of Residential . At June 30, 2014 , Mr. Erbey also held 3,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable. On April 22, 2014, Mr. Erbey surrendered 1,000,000 of his options to purchase Ocwen common stock. During the second quarter of 2014, Ocwen recognized the remaining $5.4 million of previously unrecognized compensation expense associated with these options as of the date of surrender. At June 30, 2014 , Mr. Erbey held 873,501

options to purchase Altisource common stock and 87,350 options to purchase AAMC common stock , all of which were exercisable.

Our business is currently dependent on many of the services and products provided by Altisource under various long-term contracts, including the Services Agreements, Technology Products Services Agreements, Intellectual Property Agreements and the Data Center and Disaster Recovery Services Agreements. Under the Services Agreements, Altisource provides various business process outsourcing services. Under the Technology Products Services Agreements and the Data Center and Disaster Recovery Services Agreements, Altisource provides technology products and support services. In addition, we have entered into (i) Support Services Agreements pursuant to which we and Altisource provide administrative and corporate services to each other and (ii) a Data Access and Services Agreement pursuant to which we make available to Altisource certain data from our servicing portfolio in exchange for a per asset fee. Our revenues and expenses related to our agreements with Altisource for the three and six months ended June 30, 2014 and 2013 are set forth in the table below.

Services provided by Altisource under the Services Agreement with Ocwen are generally charged to the borrower and/or loan investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales. **We believe the rates charged for these services are market rates as they are materially consistent with one or more of the following: the rates Ocwen pays to or observes from other service providers and the fees we believe Altisource charges to other customers for comparable services.**

(Emphasis added.)

82.     The 2Q 2014 10-Q was signed by Michael R. Bourque ("Bourque"), the recently appointed Executive Vice President and Chief Financial Officer and.   The accompanying Sarbanes-Oxley Certifications were signed by Bourque and Defendant Faris.

83.     Similarly, Ocwen's amended quarterly report for the first quarter of 2014 filed on Form 10-Q-A with the SEC on August 18, 2014 ("1Q 2014 10-Q-A") also falsely stated that its related party transactions were at market rates:

Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of

March 31, 2014, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 27% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 25% of the common stock of AAMC and approximately 4% of the common stock of Residential . At March 31, 2014 , Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable. On April 22, 2014, Mr. Erbey surrendered 1,000,000 of his options to purchase Ocwen common stock. At March 31, 2014, Mr. Erbey held 873,501 options to purchase Altisource common stock and 87,350 options to purchase AAMC common stock , all of which were exercisable.

Our business is currently dependent on services and products provided by Altisource under various long-term contracts, including the Support Services, Services, Technology Products Services, Intellectual Property, Data Center and Disaster Recovery Services and Data Access and Services agreements, each of which include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

84.     The 1Q 2014 10-Q-A was signed by Michael R. Bourque ("Bourque"), the

recently appointed Executive Vice President and Chief Financial Officer.  The accompanying

Sarbanes-Oxley Certifications were signed by Bourque and Defendant Faris.

85.     Similarly, Ocwen's amended annual report for the fiscal year ended December 31,

2013 filed on Form 10-K-A with the SEC on August 18, 2014 ("2013 10-K-A") also falsely

stated that its related party transactions were at market rates:

Ocwen's Executive Chairman of the Board of Directors, William C. Erbey, also serves as Chairman of the Board of Altisource, HLSS, Altisource Residential Corporation (Residential) and Altisource Asset Management Corporation (AAMC). As a result, he has obligations to Ocwen as well as to Altisource, HLSS, Residential and AAMC. As of December 31, 2013, Mr. Erbey owned or controlled approximately 13% of the common stock of Ocwen, approximately 26% of the common stock of Altisource, approximately 1% of the common stock of HLSS, approximately 27% of the common stock of AAMC and approximately 5% of the common stock of Residential . At December 31, 2013 , Mr. Erbey also held 4,620,498 options to purchase Ocwen common stock, of which 2,845,498 were exercisable, and he held 873,501 options to purchase Altisource common stock,

291,167 options to purchase Residential common stock and 87,350 options to purchase AAMC common stock , all of which were exercisable.

During 2012, Mr. Erbey relocated to St. Croix, USVI to serve as Chairman and CEO of OMS. On August 21, 2012, the Ocwen Board of Directors approved Ocwen's purchase of Mr. Erbey's residence in Atlanta, Georgia, for his cost-basis in the home of $6.5 million . The transaction is consistent with Ocwen's standard senior executive relocation policy and practice. We have classified our investment in this property as real estate held for sale, a component of Other assets. We account for the excess of cost over fair value (less costs to sell) as a valuation allowance and include changes in the valuation allowance in Loss on loans held for sale, net.

Relationship with Altisource

On August 10, 2009, Ocwen completed the distribution of its Ocwen Solutions (OS) line of business (the Separation) via the spin-off of Altisource, a separate publicly traded company. OS consisted primarily of Ocwen's former unsecured collections business, residential fee-based loan processing businesses and technology platforms. Since the spin-off, our relationship has been governed by a number of agreements that set forth the terms of our business with Altisource.

On August 10, 2012 and November 1, 2012, OMS and Ocwen each entered into a Support Services Agreement with Altisource setting forth certain services that we and Altisource will provide to each other, in such areas as human resources, vendor management, corporate services, six sigma, quality assurance, quantitative analytics, treasury, accounting, tax matters, risk management, strategic planning and compliance. These Support Services Agreements run through September 2018 and October 2017, respectively, with automatic one -year renewals thereafter.

On August 10, 2009 and October 1, 2012, Ocwen and OMS each entered into a Services Agreement, a Technology Products Services Agreement, an Intellectual Property Agreement and a Data Center and Disaster Recovery Services Agreement. Under the Services Agreements, Altisource provides various business process outsourcing services, such as valuation services and property preservation and inspection services, among other things. Altisource provides certain technology products and support services under the Technology Products Services Agreements and the Data Center and Disaster Recovery Services Agreements. These agreements expire August 31, 2025 In addition, under a Data Access and Services Agreement, we agreed to make available to Altisource certain data from Ocwen's servicing portfolio in exchange for a per asset fee.

In connection with our March 29 and April 12, 2013, sales of the Homeward and ResCap diversified fee-based businesses to Altisource, we agreed to expand the terms of our business with Altisource to apply to the services Altisource provides as they relate to the Homeward and ResCap businesses and further (i) to establish Altisource as the exclusive

provider, except as prohibited by law, of such services as they relate to the Homeward and ResCap businesses and (ii) not to establish similar fee-based businesses (or establish relationships with other companies engaged in the line of similar fee-based businesses) that would directly or indirectly compete with diversified fee-based businesses as they relate to the Homeward and ResCap businesses. In addition, we agreed that Ocwen and all of its subsidiaries and affiliates will market and promote the utilization of Altisource's services to their various third-party relationships. Finally, we and Altisource agreed to use commercially reasonable best efforts to ensure that the loans associated with the ResCap business are boarded onto Altisource's mortgage servicing platform (REALServicing). The cash consideration paid by Altisource to Ocwen in connection with the sales of the Homeward and ResCap diversified fee-based businesses totaled $87.0 million and $128.8 million , respectively. See Note 3 — Business Acquisitions for additional information. Certain services provided by Altisource under these contracts are charged to the borrower and/or investor. Accordingly, such services, while derived from our loan servicing portfolio, are not reported as expenses by Ocwen. These services include residential property valuation, residential property preservation and inspection services, title services and real estate sales.

Our business is currently dependent on many of the services and products provided under these long-term contracts which include renewal provisions. **We believe the rates charged under these agreements are market rates as they are materially consistent with one or more of the following: the fees charged by Altisource to other customers for comparable services and the rates Ocwen pays to or observes from other service providers.**

(Emphasis added.)

86.     The 2013 10-K-A was signed by Dondzilla and Defendants Bourque, Erbey, Faris, Korn, Lacy, Wish, Salcetti, and Ross.  The accompanying Sarbanes-Oxley Certifications were signed by Bourque and Defendant Faris.

87.     On April 22, 2014, Ocwen filed a Form 8-K with the SEC that stated that Defendant Erbey "surrendered 1,000,0000 of the 2,000,000 stock options previously granted to him on August 21, 2012 (such grant, the "Award") pursuant to a Surrender of Stock Options (the "Surrender Agreement")" for no consideration. Ocwen disclosed that "certain claims were made by one of the Company's shareholders, including that the Award was inconsistent with the terms of the" Company's 2007 Equity Incentive Plan.

88.     On August 4, 2014, Lawsky sent another letter to Ocwen stating that it was reviewing what it called "a troubling transaction" with Altisource relating to the provision of force-placed insurance which is "designed to funnel as much as $65 million in fees annually from already-distressed homeowners to Altisource for minimal work." The letter questioned "the role that Ocwen's Executive Chairman William C. Erbey played in approving this arrangement," which "appears to be inconsistent with public statements Ocwen has made, as well as representations in company SEC filings."

89.     On August 12, 2014, Ocwen disclosed that certain transactions between Ocwen and another related company in which Defendant Erbey holds a substantial stake and is also the Chairman of the Board, HLSS, would cause the Company to restate its financial results for the fiscal year ended December 31, 2013 and the quarter ended March 31, 2014.  Ocwen stated that the restatement would be made because of prior incorrect valuation of its financing liability with respect to mortgage servicing rights that it sold to HLSS ("Rights to MSRs").  Ocwen reported that the restatement would reveal that the pre-tax income for the first quarter of 2014 was overstated by about $17 million and that the pre-tax income for the 2013 fiscal year was understated by 2013.  As a result of the restatement, the Company announced that it expects to report material weaknesses in its internal controls.

90.     On August 18, 2014, Ocwen filed the following amended reports with the SEC: 1Q 2014 10-Q-A and 2013 10-K-A. The 1Q 2014 10-Q-A and 2013 10-K-A reported that corrections in the valuation of its financing liability in relation to MSRs resulted in the following: 1) an increase in interest expense and a corresponding decrease in pre-tax income for the first quarter of 2014 of $17.3 million; 2)  an increase in total liabilities and financing

liabilities as of March 31, 2014 of $17.3 million; 3) a decrease in net income for the first quarter of 2014 of $15.3 million; 4) a decrease in interest expense and a corresponding increase in pre-tax income for the fourth quarter of 2013 of $4.0 million; 5) a decrease in total liabilities and financing liabilities as of December 31, 2013 of $17.3 million; and 6) an increase in net income for the fourth quarter of 2013 of $4.0 million.  The amended financial statements also disclosed that Ocwen's disclosure controls and procedures and internal controls over financial reporting were not effective as of December 31, 2014 and March 31, 2014.

91.     Yet Ocwen's 1Q 2013 10-Q falsely stated under "CONTROLS AND PROCEDURES" that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

> No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

92.     Similarly, Ocwen's 2Q 2013 10-Q falsely stated under "CONTROLS AND PROCEDURES" that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended June 30, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

93.     Similarly, Ocwen's 3Q 2013 10-Q falsely stated under "CONTROLS AND PROCEDURES" that:

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 30, 2013. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2013, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.

No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended September 30, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

94.     Similarly, Ocwen's 2013 10-K falsely stated under "CONTROLS AND PROCEDURES" that:

### Evaluation of Disclosure Controls and Procedures

Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act), as of the end of the period covered by this Annual Report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as that term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f).

Under the supervision of and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have conducted an evaluation of our internal control over financial reporting as of December 31, 2013, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control—Integrated Framework (1992). Based on that evaluation, our management concluded that, as of December 31, 2013, internal control over financial reporting is effective based on criteria established in Internal Control—Integrated Framework issued by the COSO.

****

### Changes in Internal Control over Financial Reporting

There have not been any changes in our internal control over financial reporting during our fiscal quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

95.     Similarly, Ocwen's 1Q 2014 10-Q falsely stated under "CONTROLS AND PROCEDURES" that:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of March 31, 2014. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2014, our disclosure controls and procedures (1) were designed and functioning effectively to ensure that material information relating to Ocwen, including its consolidated subsidiaries, is made known to our Chief Executive Officer and Chief Financial Officer by others within those entities, particularly during the period in which this report was being prepared and (2) were operating effectively in that they provided reasonable assurance that information required to be disclosed by Ocwen in the reports that it files or submits under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to management, including the Chief Executive Officer or Chief Financial Officer, as appropriate, to allow timely decisions regarding disclosure.
>
> No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act) occurred during the fiscal quarter ended March 31, 2014 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

96.     Ocwen's 2Q 2014 10-Q disclosed that "we received a subpoena from the SEC requesting production of various documents relating to our business dealings with Altisource, HLSS, AAMC [Altisource Asset Management Corporation ("AAMC")] and Residential [Altisource Residential Corporation ("Residential")] and the interests of our directors and executive officers in these companies. Following the above-described announcement on August 12, 2014 that we intend to amend our Annual Report on Form 10-K for the fiscal year ended December 31, 2013 and our Quarterly Report on Form 10-Q for the quarter ended March 31, 2014, the Staff informed us that it plans to serve us with an additional subpoena in relation to such amendments. We are cooperating with the Staff on these matters."

97.     On October 21, 2014, Lawsky sent yet another letter to Ocwen ("Lawsky's October 21st Letter") accusing Owen of improperly backdating potentially hundreds of thousands of loan modification letters to mortgage borrowers.  Lawsky stated that Ocwen failed to investigate its backdating after an employee questioned it back in November 2013.  In some cases, the backdated letters were dated more than 30 days prior to the date that Ocwen mailed the letters, thus preventing borrowers from appealing the denials within the 30-day time frame in which borrowers are allowed to appeal such denials.  Lawsky's letter stated that Ocwen claimed to have discovered the backdating problem on its own in April 2014 and fixed it in May, and stated that subsequently Ocwen admitted that that claim it made was false.

98.     The same day, October 21, 2014, Ocwen issue a press release that responded to Lawsky's Letter.  The press release stated that only 283 borrowers in New York received backdated letters sent by Ocwen.

99.     Later that same day, Ocwen issued yet another press release correcting the prior press release, and admitting that it does not know how many borrowers received backdated letters sent by Ocwen.

100.    On October 22, 2014, Bloomberg published an article stating that Ocwen's having backdated thousands of letters may have violated a consent order it entered as part of its $2.2 billion settlement with the CFPB.   The consent order states that Ocwen has to ensure that borrowers have "30 days from the date of the written non-approval notice" to appeal the notice.

101.    That same day, Moody's Investor Service made the decision to downgrade its quality assessment of an Ocwen unit servicing residential and subprime-residential loans, citing Lawsky's October 21st Letter.

102.     On October 23, 2014, Bloomberg published an article that stated that Ocwen's backdating of letters has drawn the attention of 3 attorneys general pertaining to a potential breach of the $2.2 billion settlement.

## DAMAGES TO OCWEN

103.     As a direct and proximate result of the Individual Defendants' conduct, Ocwen has expended and will continue to expend billions of dollars.

104.     Such expenditures include, but are not limited to, legal fees associated with the $2.2 billion settlement with CFPB and 49 attorneys general, class actions lawsuits filed against the Company for violations of the federal securities laws, "a number of pending federal and state regulatory investigations, examinations, inquiries, requests for information and/or other actions," Ocwen's "failure to comply with the commitments we have made with respect to such regulatory actions or other regulatory actions," and amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations.

105.     As a direct and proximate result of the Individual Defendants' conduct, Ocwen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

106.     Plaintiff brings this action derivatively and for the benefit of Ocwen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ocwen, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

- 43 -

107.    Ocwen is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.    Plaintiff is, and at all relevant times has been, an Ocwen shareholder.  Plaintiff will adequately and fairly represent the interests of Ocwen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

110.    A pre-suit demand on the Board of Ocwen is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following seven Individual Defendants: Erbey, Faris, Korn, Ross, Lacy, Salcetti, and Wiseh (collectively, the "Directors").  Plaintiff needs only to allege demand futility as to four of the seven Directors that are on the Board at the time this action is commenced.

111.    Defendant Erbey, as the Company's Executive Chairman, and Defendant Faris as the Company's CEO and President, are thus non-independent Directors.  They were ultimately responsible for the Company's operations, internal controls, and false and misleading statements and omissions during the Relevant Period.  Moreover, Erbey has also been Chairman of the Board and controlling stockholder of Ocwen's affiliates, Altisource, HLSS, Residential, and AAMC, some of which engaged in undisclosed unfair related party transactions with Ocwen that benefitted Erbey.  Additionally, Defendant Faris owns at least 29,000 shares of AAMC restricted stock.  In complete abdication of their fiduciary duties, Erbey and Faris participated in the

fraudulent scheme to make the Company appear more profitable and attractive to investors and to facilitate the self-dealing related party transactions. As a result, Erbey and Faris breached their fiduciary duties. Thus Erbey and Faris face a substantial likelihood of liability, and demand upon them is futile and, therefore, excused.

112.   During the Relevant Period. Defendants Wish and Ross sold huge amounts of Ocwen stock with inside information that the Company about the truth behind the Company's false and misleading statements and omissions of material fact that caused Company stock price to be artificially inflated. Indeed, on September 23, 2013, 3.15 million shares of Ocwen stock that Defendant Ross beneficially owned were sold through insider trading at the artificially inflated price of $50.19. Additionally on July 14, 2014, 1.95 million shares of Ocwen stock that Defendant Ross beneficially owned were sold through insider trading at the artificially inflated price of $37.00. From March through November 2013 Wish had an illicit windfall by selling via insider trading 1.05 million shares of Ocwen for between $40.44 to $53.57 per share. Ocwen's stock price closed at $18.88 per share on October 27, 2014. Because Defendants Ross and Wish face a substantial likelihood of liability for their insider trading, and because they benefitted from the Defendants' concealment of the illicit mortgage-servicing practices and false and misleading statements and omissions of material facts, any demand upon them is futile.

113.   Likewise, Defendants Korn, Salcetti, and Wish, as members of the Audit Committee acted in violation of the Audit Committee Charter, as they conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and of the Company's engagement in transactions, including engaging in improper mortgage-servicing practices and unfair, self-dealing, related party transactions, consciously disregarded their duties

to monitor such controls over reporting and engagement in transactions, and consciously disregarded their duties to protect corporate assets.  The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in transactions that were not in the best interest of the Company.  Thus, Defendants Korn, Salcetti, and Wish face a substantial likelihood of liability for their breach of fiduciary duties.  Because these Defendants face a substantial likelihood of liability, any demand upon them is futile.

114.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the aforementioned scheme to engage in improper mortgage-servicing practices and unfair, self-dealing, related party transactions, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

115.    In complete abdication of their fiduciary duties, all of the Directors either participated in or were recklessly unaware of the fraudulent scheme to make the Company appear more profitable and attractive to investors, and to increase the Company stock price.  As a result, the Directors breached their fiduciary duties.  Thus, the Directors face a substantial likelihood of liability, and demand upon them is futile.

116.    The Directors, as members of the Board, were and are subject to the Code of Ethics.  The Code of Ethics went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics required the Directors to also adhere to Ocwen's standards of business conduct.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics by causing the Company to

engage in improper mortgage-servicing practices and unfair, self-dealing, related party transactions, fail to maintain adequate internal controls, and to make false and misleading statements and omissions of material fact.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

117.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other, especially to Defendants Erbey, Faris, and Britti.

118.    Members of the Board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Board from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

119.    Ocwen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct that has been engaged in for at least a year and a half to attempt to recover for Ocwen any part of the damages Ocwen suffered and will continue to suffer thereby.  Thus, any demand on the Directors would be futile.

120.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

121.   The acts complained of herein constitute violations of fiduciary duties owed by Ocwen's officers and directors and these acts are incapable of ratification.

122.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ocwen.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Ocwen, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

123.   If there is no directors' and officers' liability insurance, then the Directors will not cause Ocwen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

124.    In addition, demand on the Directors is futile because when given opportunities to cooperate with the investigation by NY DFS that would reveal the extent of Ocwen's violations, and thus the potential harm caused by the Individual Defendants to the Company, the Directors and other Individual Defendants failed to cooperate, thus blocking the investigation.    Thus, demand is excused.

125.    Thus, for the reasons set forth above, all of the Directors, and, if not all of them, certainly a majority of the Directors, cannot consider a demand with disinterestedness and independence.   Consequently, a demand upon the Directors is excused as futile.

126.    Overall, the Company has and will expend billions of dollars in legal fees associated with the $2.2 billion settlement with CFPB and 49 attorneys general, class actions lawsuits filed against the Company for violations of the federal securities laws, "a number of pending federal and state regulatory investigations, examinations, inquiries, requests for information and/or other actions," Ocwen's "failure to comply with the commitments we have made with respect to such regulatory actions or other regulatory actions," and amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations. Moreover, the Company's reputation has been severely damaged.  The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers.  Its market capitalization has been severely diminished.  All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

127.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

128.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ocwen's business and affairs.

129.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

130.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Ocwen.

131.    In breach of their fiduciary duties owed to Ocwen, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to properly oversee Ocwen's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

132.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though

such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ocwen's securities and disguising self-dealing transactions.

133.   The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly engage in illicit mortgage-servicing practices, and fail to maintain adequate internal controls.  Defendants had actual knowledge that the Company was improperly engaging in illicit mortgage-servicing practices, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in illicit mortgage-servicing practices, and fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ocwen's securities and engaging in self-dealing transactions.

134.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

135.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ocwen has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Abuse of Control

136.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

137.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ocwen, for which they are legally responsible.

138.     As a direct and proximate result of the Individual Defendants' abuse of control, Ocwen has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Ocwen has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### THIRD CLAIM

### Against Individual Defendants for Gross Mismanagement

139.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ocwen in a manner consistent with the operations of a publicly-held corporation.

141.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ocwen has sustained and will continue to sustain significant damages.

142.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

143.     Plaintiff, on behalf of Ocwen, has no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

144.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145.     By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ocwen.

146.     During the Relevant Period, the Individual Defendants either benefitted financially from the self-dealing transactions, or received bonuses, stock options, or similar compensation from Ocwen that was tied to the performance or artificially inflated valuation of Ocwen or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

147.     Plaintiff, as a shareholder and a representative of Ocwen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ocwen, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and

- 53 -

abetted the breach of their fiduciary duties to Ocwen;

(c)    Determining and awarding to Ocwen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Ocwen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ocwen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Ocwen to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Ocwen restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 6, 2014   Respectfully submitted,

         **THE ROSEN LAW FIRM, P.A.**

      By:   */s/ Laurence Rosen*

        Laurence M. Rosen
        Fla. Bar No. 0182877
        275 Madison Avenue, 34th Floor
        New York, NY  10016
        Tel.:  (212) 686-1060
        Fax:  (212) 202-3827

        *Attorneys for Plaintiffs*